UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO. 25-CR-20010 |
| v. | HON. SUSAN K. DeCLERCQ<br>United States District Judge |
| TRAVIS ESKRIDGE, | |
| Defendant. | |

**Sentencing Memorandum by the United States**

Travis Eskridge, a registered nurse, exposed emergency room patients to bodily injury by tampering with vials of fentanyl. He removed fentanyl vials without a doctor's order, injected himself with the fentanyl, substituted saline, and placed the useless vials back into the emergency room medicine supply. He acted with reckless disregard and extreme indifference to the plight of patients desperately in need of pain relief. The defendant offered patients continued pain instead of compassionate care. Exposing emergency room patients to severe untreated pain is a reprehensible crime. This criminal behavior by Travis Eskridge merits a guideline sentence of imprisonment of 46 months.

## **OFFENSE CONDUCT**

On August 9, 2022, a nurse at a Detroit hospital emergency room accessed a single- use vial of fentanyl from the automated medicine storage system (Pyxis). The nurse noticed the vial had a punctured stopper and appeared to be partially empty. Upon the discovery of this tampered vial, the hospital searched all the Pyxis machines in the emergency room and found a total of three tampered fentanyl vials, which were stored in three separate Pyxis machines. The hospital submitted these vials to a private laboratory who determined the liquid in the vials was significantly diluted or contained no fentanyl at all, meaning most or all of the fentanyl had been replaced with another liquid.

On August 10, 2022, nurse Travis Eskridge was interviewed by hospital administrators. After initially denying it, he eventually admitted stealing fentanyl for his personal use. His confession was given orally and in a handwritten statement. On the same date Eskridge submitted to a urine drug test, which revealed fentanyl in his system. Fentanyl remains detectable in the body for 24 to 48 hours after use. On the same date hospital administrators searched Eskridge's locker and discovered two additional tampered vials of fentanyl. These vials were examined by the Food and Drug Administration, Forensic Chemistry Center laboratory and were found to have multiple puncture marks in the vial stoppers and the liquid in the vials was

significantly diluted, meaning most of the fentanyl was replaced with another liquid. The hospital immediately placed Eskridge on leave, and he was ultimately fired.

Nurse Eskridge was the only nurse who conducted fentanyl transactions in all three of the Pyxis machines where the tampered fentanyl vials were discovered during the month leading up to the discovery of the tampered vials. Further review of hospital records identified multiple instances dating back to December of 2021 when Eskridge withdrew fentanyl or other controlled substances from the machines without a physician's order. A review of hospital records identified 13 occasions between December 22, 2021, and July 25, 2022, when Eskridge removed vials of fentanyl from Pyxis machines and delayed the return of the vials to the Pyxis machines. These lengthy delays, averaging over an hour, provided Eskridge ample time to tamper with the vials. These delayed returns increased over time with 5 of the 13 returns taking place in July of 2022, shortly before the tampered vials were discovered by the hospital.

Between May 2, 2022, and August 8, 2022, hospital records revealed Eskridge removed 178 vials of fentanyl from Pyxis machines without a physician's order. His removal of fentanyl without a physician's order increased over time. In May of 2022 – 40 vials. In June of 2022 – 60 vials. In July of 2022 – 73 vials. In August of 2022 – 5 vials (Eskridge only worked one day in August of 2022 before he was put on leave and fired).

On December 2, 2022, law enforcement interviewed Eskridge at his residence. The defendant admitted removing multiple vials of fentanyl without a physician's order for his personal use. As his fentanyl use grew over time, the amount of fentanyl he stole from the hospital increased. Eskridge admitted he tampered with the two fentanyl vials discovered in his locker by using the fentanyl and then injecting saline into both vials. He would not admit to returning tampered vials of fentanyl to Pyxis machines, but stated it was "possible." In his factual basis for this guilty plea the defendant admitted returning tampered vials to the storage machines. Accordingly, the government believes the defendant has accepted responsibility for this offense.

According to the hospital, patients receiving fentanyl often include trauma patients with painful injuries, intubated patients requiring sedation, and patients requiring sedation before a painful procedure such as realigning a bone fracture. Trauma victims include car accident victims and those with gunshot wounds.

Eskridge also created a risk of bacterial contamination. The vials are manufactured to be preservative free and should be used immediately after being punctured. The manipulation of the contents could introduce pathogens into the vial, which could cause infection. There is also a risk of blood borne pathogens being introduced into the vial if a person uses a needle to inject themselves and then uses the same needle to refill the vial with saline.

Eskridge also treated patients while under the influence of fentanyl. While there are no identified victims of substandard care caused by his drug use, his statement in December of 2022 to the FDA indicated the drug abuse affected his memory of events at the hospital. His defense "risk assessment" report interview indicates while at work he would inject himself, and eventually if he did not continue to inject himself, he would go through withdrawal. (Zoltowski Report at 5) The change in his work behavior was so profound the defendant believed one of the nurses at work knew "something was up." (Id.)

### I. The defendant chose to tamper with fentanyl vials in order to cover up his theft of drugs.

The cover-up was far worse than the original crime. Eskridge could have stolen fentanyl, used the drugs and thrown away the vials on every occasion. Tampering was a deliberate and calculated choice. He wanted to avoid getting caught. So he exposed patients to the risk of severe untreated pain and disease. Eskridge was willing to torture patients with untreated pain to keep his nursing job, his nursing license and his comfortable life in Grosse Pointe Park. This is the criminal behavior that must be addressed by this Court's sentence.

The defendant had other choices. He did not have to cover up his opiate dependence or substance use disorder (SUD) and drug thefts by tampering. He had access to first class medical treatment. He chose treatment at the Brighton Center

for Recovery immediately after his tampering was discovered. The defendant's choice not to seek treatment earlier put patients at risk of untreated pain and disease.

Unlike Eskridge, emergency room patients often have no choice but to be rushed to the nearest hospital for treatment. Patients trust that medical help, including pain relief, will be provided. Travis Eskridge betrayed that trust.

It is true that no patients were identified as victims in this case. But identifying particular patient victims would have been very difficult. If the tampered vial was not detected before the "fentanyl" was injected, it is unlikely a patient's lack of pain relief would result in a re-examination of the discarded fentanyl vial. There are other reasons besides tampering that make a fentanyl injection appear ineffective. For example, if a patient is a regular user of opiates and has developed tolerance, the drug may not be effective. If a patient does not respond to an initial dose of fentanyl, a higher dosage may be required to relieve pain.

Apparent tolerance or not responding to the initial dose of fentanyl by patients creates an additional risk of death or bodily injury. If a patient is not responding to the initial dose of tampered fentanyl, it is always possible the doctor might order a larger second dose. Then the patient could suffer an overdose. Unlike the patients, Eskridge had choices. He could have simply stolen the drugs without replacing them with tampered vials. Or he could have sought treatment.

The fact no individual victims were identified is not a reason to impose a lower sentence. If identified patients were injured, there would be an enhancement of two to four levels. U.S.S.G. § 2N1.1(b). This would have resulted in a higher guideline and a higher recommendation. (E.g. Attachment A, No. 1, *U.S. v. Mollohan*, 1:18cr87, WD Michigan, sentence of 82 months.) The fact vulnerable victims were not identified does not take this case out of the heartland of the guideline and does not justify a variance to a below-guidelines sentence. This is within the "heartland" of hospital tampering cases, and the Court needs a "compelling justification" for an extreme variance in a "mine-run" case. *United States v. Boucher,* 937 F3d 702, 709-714 (6th Cir. 2019). A review of the cases in Attachment A reveals this is a typical nurse tampering case.

The defendant is not being sentenced because he has substance abuse disorder. It is true but remarkably unhelpful to say that but for the defendant's drug use disorder, he would not have committed this tampering crime. The same thing can be said for the drug user who embezzles from his employer to pay for drugs, then burns down the employer's offices to cover up the embezzlement. Just because a series of crimes begins with the goal of obtaining drugs does not mean the sentence for the most serious crime should be based only on what is necessary to prevent future drug use.

A defendant could commit any number of crimes to support and conceal his drug habit: embezzle from his employer, sell heroin, or engage in espionage for money. The nature and circumstances of the offense of conviction must be considered at sentencing. 18 U.S.C. § 3553(a)(1). While the Court must also consider a sentence that will protect the public from future crimes of the defendant, 18 U.S.C. § 3553(a)(2)(C), that is not the only consideration. Otherwise, a defendant with a low risk of relapsing into drug use would routinely be sentenced to one year of probation with drug treatment, regardless of the nature and circumstances of the offense. The principle that serious offenses should be excused with a term of probation because the defendant was covering up his drug use cannot be accepted.

Former U.S.S.C. § 5H1.4, which was deleted effective November 1, 2025, stated in relevant part that "Drug or alcohol dependence or abuse ordinarily is not a reason for downward departure." The former guideline was based on 28 U.S.C. § 944(c)(d)(6), which required the Sentencing Commission to take "drug dependence" into account "only to the extent that they do have relevance." The wholesale removal of the grounds for departure in U.S.S.G. §§ 5H1.1-12 was not based on a determination that all of these factors are suddenly relevant and should be given great weight at sentencing. Rather, the purpose was to move from a three-step process to a two-step process, where the sentencing court is free to give such factors

8

whatever weight they deserve.  See U.S.S.G. Chapter One, Part A, effective Nov. 1, 2025.

The "risk assessment" Zoltowski report opines this defendant has a low risk of re-offending.  The chance of defendant Eskridge once again tampering with consumer products in a hospital setting may or may not be low.  But the critical questions are (a) what is his risk of relapse into drug abuse, and (b) in the event of a relapse, would he again attempt to cover it up.  Patients with substance abuse disorder are notoriously likely to relapse.  (National Institute of Health Library, Sinha R. New findings on biological factors predicting addiction relapse vulnerability. Curr Psychiatry Rep. 2011 Oct;13(5):398-405. doi: 10.1007/s11920-011-0224-0. PMID: 21792580; PMCID: PMC3674771, accessed on 10/26/2025 at https://pmc.ncbi.nlm.nih.gov/articles/PMC3674771/ )

The defendant's history of drug abuse is understated in the risk assessment report.  The defendant told the probation officer (PSR at ¶ 34) and the risk assessment interviewer that his opiate problem started after a ski accident in January of 2022.  (Zoltowski Report 5-6)  He says the doctors at work "asked if he wanted anything for the pain."  He stated "they would give him Norco.  He began misusing the Norco but was still getting prescriptions for it…. Eventually the doctors stopped prescribing opiates for him."  (Zoltowski Report 5)  At this point, in May of 2022, he began stealing fentanyl in the hospital.  This history has the defendant's opiate drug

9

problem starting at some point after January of 2022, switching to fentanyl abuse in May of 2022 and ending in early August of 2022.

The defendant's MAPS (Michigan Automated Prescription Service) record contradicts this narrative. According to MAPS, during the entire year of 2022 the defendant filled a single controlled substance prescription in Michigan. On February 21, 2022, one of the doctors at the Emergency Room prescribed Eskridge 14 pills, a three-day supply of Norco (hydrocodone 5 mg/acet 325). (Attachment B, MAPS report, sealed) According to this State of Michigan record, multiple doctors did not keep giving him prescriptions in 2022. One doctor gave him 14 pills on a single occasion. The undersigned confirmed with a Michigan MAPS employee that all prescriptions filled at a pharmacy, even a hospital pharmacy open to the public, would be reported in MAPS. Only controlled substance medications dispensed directly to a hospital patient from the hospital's supply would not be reported. And prescriptions are not written for inpatient dispensing. So the defendant's recollection that he received multiple opiate prescriptions from multiple ER doctors in 2022 is not accurate. His statement for the risk assessment report that he "began misusing the Norco" (Zoltowski Report at 5) is inconsistent with the 12 pills prescribed in 2022. It should also be noted that he answered one of the assessments "in a manner designed to portray himself as relatively free of shortcomings" and "reluctant to acknowledge even minor faults within himself." (Id. at 7)

The government submitted information to the Probation Department that the defendant had a history of removing fentanyl vials without a doctor's authorization, not just between May and August of 2022, but dating back to December of 2021. The defendant objected to the inclusion of that information in the PSR because, according to the defense, the absence of records "may be failure of the ordering doctor" to create a written order. In response to the objection Probation removed that information from the PSR. Whether or not it is in the PSR, it is an indisputable fact the defendant in fact had unauthorized withdrawals of liquid fentanyl dating back to December of 2021.

The MAPS report shows the defendant receiving occasional controlled substance prescriptions from emergency room doctors before the reported ski accident in January of 2022. A prescription for 30 dosage units (7 days) of a higher strength drug, hydrocodone 7.5 mg/acet 325, was written and filled on July 12, 2021. A prescription for 20 dosage units of codeine#3/acet was written and filled on January 18, 2021. A prescription for 20 dosage units of codeine#3/acet was written and filled on November 27, 2020. And a prescription for 12 dosage units of hydrocodone 5 mg/acet 325 was written and filled on November 11, 2020. That is a total of 52 dosage units in a three-month period, not a particularly excessive amount, but one without an explanation in the PSR or the report.

Far more concerning are medical records from the defendant's rehabilitation, which report him using Vicodin (hydrocodone, a prescription opiate pain reliever) years earlier, in 2013, "when he was going through a bad divorce." PSR ¶ 47. The government has not been given access to those medical records, although the risk assessment reviewer and the Probation Department both reviewed them. Using Vicodin to deal with a bad divorce is decidedly not in compliance with prescription instructions. It is a strong indicator of substance abuse disorder. If the defendant was abusing opiates long before 2022, as early as 2013, it would suggest a more serious drug problem and a greater chance of relapse. It does not appear that the author of the risk assessment report asked the defendant to explain how abusing opiates to deal with his divorce in 2013 is consistent with reporting the first time he misused opiates was in 2022 after a skiing accident.

The extent of the defendant's prior drug use is primarily relevant to occupational restrictions and the length of the term of supervised release to be imposed. It bears repeating that the government is not asking for a sentence of imprisonment because of the defendant's substance abuse, whatever the actual history. A sentence of imprisonment is required due to the offense of drug tampering.

Tampering is far more serious than illegal drug use or stealing drugs from a hospital. The guideline base offense level for tampering is 25. After adjustments the recommended sentencing range for defendant Eskridge is 41-51 months. The

offense level for theft of medical products by an employee is 10. 2B1.1(a)(2), 2B1.1(b)(8)(B). After adjustments the recommended theft sentencing range for defendant Eskridge would be level 6, 0-6 months (in Zone A, the authorized "probation" zone of the guidelines. Sentencing Table; 5B1.1). The adjusted sentencing range for illegal possession of Schedule II controlled substances like fentanyl, or acquiring Schedule II drugs by fraud or deception, would also be 0-6 months (Zone A, authorized probation). 2D2.1(a)(1), 2D2.2.

Tampering exposes others to the risk of bodily injury. That risk was unnecessary if all the defendant wanted to do was steal drugs. Theft of drugs does not involve torturing patients with untreated pain. But Eskridge didn't just want drugs. He also wanted to keep his job, his income, his license and his status. He continued to work in the hospital emergency room while he was under the influence of the fentanyl he was stealing. He was willing to deprive suffering patients of pain relief to protect himself. That behavior is especially heinous for a licensed medical professional.

## II.   The facts do not support a downward variance.

Blaming the defendant's drug abuse does not support a downward variance. The defendant told Probation he reached age 50, in 2022, before a skiing accident caused him to use prescription opiate medication for the first time "without complying with prescription instructions." PSR ¶ 54. On the other hand, medical

records report him using Vicodin (a prescription opiate pain reliever) in 2013, "when he was going through a bad divorce." PSR ¶ 47. Using Vicodin to deal with a bad divorce is decidedly not in compliance with prescription instructions.

The defendant's personal characteristics do not support a downward variance. His childhood in Ann Arbor appears to have been economically and socially privileged. He was educated, held a job as a nurse, married, raised children and otherwise functioned well in society. His substance abuse history, his current recovery and letters of support are not sufficiently unusual or extraordinary to justify a downward variance.

Some courts justify a downward variance because the defendant will never again work as a nurse. (E.g. Attachment A, No. 39, *U.S. v. Nichols,* 1:23-cr-00110 (NH) "the defendant has agreed to the forfeiture of her nursing license, and therefore her career as a nurse…[this] will not only protect patients, but also protect the defendant by greatly diminishing her ability to access opioid drugs.") That does not apply to Eskridge, whose nursing license was suspended for 6 months and a day, with a $2,500 fine and a right to re-apply for his license, although reinstatement is not automatic. The State of Michigan agreement provides that "no additional discipline may be imposed as a result of this criminal case."

The defendant's current bond restrictions prohibit him from working in a setting where controlled substances are present or stored. (R. 9: Conditions of Bond,

at 36). This Court should impose a similar occupational restriction, including not working at a place where controlled substances are present, stored or prescribed, as a condition of supervised release, in order to protect the public. 18 U.S.C. § 3153(a)(2)(C). This would suggest there should be no early termination of supervised release, which is otherwise often granted after one year of successful supervised release.

### III. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct does not support a downward variance.

The Court should impose a sentence consistent with the sentence imposed in a very similar case previously sentenced in the Eastern District of Michigan.

Nurse Mary Cheatham (Attachment A, No. 10, 21-cr-20519 (ED MI)), stole 116 vials of hydromorphone from hospital dispensing machines. Nurse Travis Eskridge stole 178 vials of fentanyl from hospital dispensing machines. Both nurses left ineffective vials for the patients who needed them for severe pain. In both instances no specific victims were identified and no identifiable person was injured. Both defendants used the drugs while in the hospital during working hours. Cheatham had a more pronounced history of drug abuse, resulting in two countable misdemeanor convictions. Her guidelines were Level 24, Criminal History II, 57-71 months. She also had significant factors supporting a downward departure,

including abuse as a child, that are not present with defendant Eskridge. Nurse Cheatham received a sentence of 48 months.

The government conducted a review for the past five years by searching federal court dockets for cases involving the same statute of conviction, tampering or attempted tampering with a consumer product involving risk of death or bodily injury, in violation of 18 U.S.C. § 1365(a)(4). (Attachment A.) Cases not involving tampering with controlled substances by a medical professional in the health care field were excluded, so none of the listed cases involve putting THC in ice cream sold to the public. (E.g., *U.S. v. Flore*, 24cr00023, NH) While an attempt was made to find every relevant case, as of August, 2025, it is very difficult and time-consuming to search nationwide dockets for these cases, and some were undoubtedly missed. But no cases similar to this one were intentionally excluded from this analysis.

This analysis is far more informative than information derived from the U.S.S.C. database, reflected in ¶ 91 of the Presentence Report. The principal flaw in using the data for the past five fiscal years at Level 22 is that during 4 of the last 5 fiscal years (FYs 2020, 2021, 2022, 2023, ending Nov. 1, 2023) the two-point zero offender reduction was not in place. Defendants with "similar conduct" (as defined in 18 U.S.C. § 3553(a)(6)) during those four earlier fiscal years are found at Level 24 or higher, due to the absence of a zero-point reduction. In order to be

placed at Level 22, CH I during the prior years, a defendant would need either a minor role adjustment, or else not to receive a two-point enhancement for abuse of position of trust. Defendants who engaged in "similar conduct" (18 U.S.C. § 3553(a)6)) as Eskridge in the years before the zero-point reduction are found at Level 24, Criminal History I or higher, and those defendants are not reflected in ¶ 91, except for fiscal year 2024.

 A second problem with over-reliance on the past five fiscal years of data is that it includes up to two years of sentences influenced by the covid-19 pandemic. Sentences of incarceration were at times avoided in 2020-2021 due to the risk of covid infection and death in the federal prison system, which was greatly impacted by the pandemic. I recall a judge sentencing during covid saying "I am not sentencing the defendant to death for this offense." Tampering defendants are typically first offenders with good employment history and family support. The goal of avoiding incarceration when that might prove fatal affected whether incarceration was ordered, the place of incarceration (home confinement) and the length of sentences. The covid factor undoubtedly had a downward effect on the sentences listed in both Attachment A and PSR ¶ 91 during the pandemic years.

 The range of sentence variation imposed in similar cases is substantial. A review of cases in Attachment A suggests similar sentences have not been imposed for similar conduct on defendants with similar criminal records. Individualized

17

sentencing does play a role. For example, where the defendant's three teen-aged children would have been placed in the exclusive custody of an abusive non-custodial spouse with a history of mental illness, avoiding a prison sentence was perhaps understandable. (Attachment A, No. 36, *U.S. v. Monticone*, 3:21-CR-00031 (Conn)) However, the normal disruption of family ties and responsibilities is a predictable consequence of a custodial sentence, and absent unusual circumstances was not ordinarily a basis for a lower sentence. U.S.S.G. § 5H1.5, deleted effective November 1, 2025; see 28 U.S.C. § 944(d)(7).

Exhibit A generally reveals three distinct approaches to sentencing. A significant percentage of judges view tampering with medications that could deprive patients of pain relief as a serious one deserving a sentence of imprisonment of several years or more. These sentences are at or reasonably near the guideline range. (Attachment A, Nos. 2-24, sentences from 63-20 months)

A small percentage of judges view this offense only as a drug abuse problem and impose probation or a minimal sentence, with drug treatment and monitoring. This approach views tampering as no more serious that the theft of drugs. These sentences blame the drugs, not the defendant. (Attachment A, Nos. 36-40, sentences of probation or 4 weekends of custody)

Finally, some judges impose a token sentence involving some months of prison time and/or home confinement. As noted above, some of these sentences

may have been influenced by the pandemic. While not reflecting the full seriousness of tampering, such defendants still receive some penalty involving a custodial sentence. (Attachment A, Nos. 25-35, sentences ranging from 16 months to one month, including home detention)

The government believes the approach of the Sentencing Guidelines and the judges who impose sentences within or reasonably near the guideline range more accurately reflect an appropriate balance of sentencing factors under 18 U.S.C. § 3553(a). That is particularly so here, where defendant Eskridge does not have any of the unusual factors present in some other cases, such as being a victim of childhood sexual abuse or being the sole competent caregiver of minor children.

## **CONCLUSION**

The government recommends a term of imprisonment of 46 months, with occupational restrictions against working within an environment where controlled substances are possessed or controlled substance prescriptions are issued, as a

condition of supervised release.

Respectfully Submitted,

JEROME F. GORGON, Jr.
United States Attorney

s/ WAYNE F. PRATT
Assistant United States Attorney
211 West Fort St., Ste. 2001
Detroit, MI 48226
Phone: (313) 226-9583
Email: wayne.pratt@usdoj.gov

Dated: November 6, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I electronically filed the foregoing with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to all counsel of record.

s/WAYNE F. PRATT
Assistant U.S. Attorney
211 W. Fort Street, Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9583
Email: wayne.pratt@usdoj.gov
